IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **JAMES STEPHEN SPENCER,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:24-cv-160** |
| | § | |
| **COLLIN COUNTY, TEXAS,** | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, James Stephen Spencer, (hereinafter referred to as "Plaintiff"), who brings this action pursuant to 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343, and the Fourth and Fourteenth Amendments to the United States Constitution, to vindicate his right to be free from wrongful arrest, prosecution, and confinement, and files this Complaint, complaining of and about Collin County, Texas (hereinafter referred to as "the County" or "Defendant"), and for cause of action would show the Court as follows:

## INTRODUCTION

1.     Plaintiff, James Stephen Spencer, was a victim of the well-publicized political witch hunt perpetrated against former Collin County Judge Suzanne Wooten by the Collin County District Attorney's Office (CCDAO).[1]

2.     The Special Crimes Unit was a subset of the CCDAO used by John Roach, Sr., the then District Attorney of Collin County, Texas, to investigate high-profile white-collar crimes During the time that Collin County Assistant District Attorney Christopher Milner led the Special Crimes Unit, at the direction of Roach, the CCDAO had a pattern and practice of using its authority

---

[1] This case is analogous to Judge Wooten's federal Civil Rights lawsuit against Collin County, Texas. Case No. 4:18-cv-00380-ALM.

to investigate, threaten to prosecute, or to prosecute cases that lacked probable cause of guilt against individuals with which members of the District Attorney's office had personal, professional, or political differences. While Milner led the implementation of the policies that resulted in these patterns and practices, Roach, as the chief policy maker for Collin County in regard to the investigation and prosecution of criminal matters, endorsed these policies and practices.

3.      Plaintiff was the consultant for Judge Wooten's 2008 campaign unseating the incumbent Judge of the 380th District Court in Collin County. This upset Roach and Milner, and the CCDAO led a political witch hunt to remove Judge Wooten from the bench.

4.      The CCDAO wrongfully obtained indictments and prosecuted Judge Wooten, Plaintiff, David Frederick Cary, and Stacy Stine Cary – a married couple who Plaintiff's clients on unrelated matters – by inventing and perverting the law and misleading multiple grand juries, judges, and trial juries.

5.      Not only did Milner and Roach know that Plaintiff, Judge Wooten, and the Carys did not engage in the conduct alleged by the CCDAO, but they also knew full well that the law did not proscribe any of the alleged conduct.

6.      This improper multi-year inquisition resulted in the unconstitutional convictions of Judge Wooten, Plaintiff, and the Carys.

7.      Plaintiff was wrongfully arrested, charged, and convicted of multiple contrived counts of 1) Engaging in Organized Criminal Activity—Bribery, Money Laundering, Tampering with a Governmental Record; 2) Bribery; and, 3) Money Laundering.

8.      As a result, Plaintiff was placed on probation for ten years where as conditions of that probation, he was incarcerated for 100 days, forced to pay a $10,000 fine, and forced to

complete 1,000 hours of community service. Additionally, Plaintiff was ordered to pay approximately $90,000 in court costs and attorney's fees for his court appointed counsel.

9.    All of these convictions have since been vacated and all of Plaintiff, Judge Wooten, and the Carys were exonerated, with two separate courts finding that both Judge Wooten and Plaintiff suffered violations of their due process rights.

10.    Plaintiff now sues to recover for the harm done to him by the County who unjustly targeted him in its scheme to remove Judge Wooten from the bench.

**I.**
**JURISDICTION AND VENUE**

11.    The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

12.    Venue is proper in the Sherman Division, Eastern District of Texas pursuant to 28 U.S.C. § 1391, as all or a substantial part of the cause of actions of which Plaintiff complains occurred in Collin County, Texas.

13.    *In personam* jurisdiction is satisfied as to Defendant Collin County because it is a governmental entity and therefore resides in Texas and/or transacts business in the State of Texas, such that this Court's exercise of personal jurisdiction over the Defendant is consistent with all applicable statutory requirements and constitutional guarantees.

**II.**
**PARTIES AND SERVICE**

14.    Plaintiff, James Stephen Spencer, is a resident of Hays County, Texas.

15.    Defendant Collin County is a political subdivision of the State of Texas located in the Eastern District of Texas. Collin County, Texas can be served through its County Judge, Chris Hill, at 2300 Bloomdale Rd., McKinney, TX 75071, or wherever he may be found.

## III.
## FACTS

16.     Plaintiff James Stephen Spencer, a consultant, was employed by former Collin County Judge Suzanne Wooten as her campaign strategist and media consultant during her judicial campaign in 2008 to become the 380th District Court Judge in Collin County, Texas.

17.     On March 4, 2008, Suzanne Wooten, defeated the incumbent Judge Charles Sandoval in the Republican primary election for the 380th District Court Judge in Collin County, Texas.  In the history of Collin County, Texas, an incumbent district judge had not been challenged for re-election until Plaintiff won the primary by a landslide. Then, on November 4, 2008, Judge Wooten won the General Election. Judge Wooten's term began January 1, 2009.

18.     On March 5, 2008, the day after losing the Republican primary election, Judge Sandoval went to the Collin County District Attorney's Office (CCDAO) to complain about Judge Wooten. Judge Sandoval felt there was no way Judge Wooten could have won the Republican primary election without cheating, insinuating to the CCDAO that they needed to find a crime that Judge Wooten committed.

19.     Thereafter, in 2008 and prior to Judge Wooten taking the bench, the CCDAO decided to conduct its own investigation into Judge Wooten's campaign and used grand jury proceedings to aid in their investigation.

20.     Law enforcement did not initiate this investigation, nor did law enforcement aid in this investigation. This investigation originated and was subsequently conducted by the CCDAO and, later, by the Office of the Attorney General (OAG) acting in conjunction with the CCDAO.

21.     This case involved four co-defendants. The first was Judge Wooten, who was the target of the political witch hunt. Two of the co-defendants were a married couple named David Frederick Cary and Stacy Stine Cary (Collectively "the Carys"), who were Plaintiff's clients on

unrelated matters. Plaintiff was the final co-defendant, who not only was employed by Judge Wooten during her political campaign, but also assisted the Carys with other matters.

22.     The investigation lasted over two years before Judge Wooten, Plaintiff, and the Carys were initially indicted on October 14, 2010. Another nine months passed before the final indictment against Judge Wooten, Plaintiff, and the Carys was filed on July 14, 2011. Each of the indictments for Plaintiff, the Carys, and Judge Wooten is substantially identical as the allegations track the same statutory language and same alleged scheme of conduct.

23.     Although the investigation began as one directed at alleged violations of the Texas Election Code, no criminal charges were pursued, and no indictment was returned for any alleged violation of the Texas Election Code.

24.     Upon learning of the indictments, Plaintiff was also forced to travel to Collin County to surrender, where he was booked into the jail, searched, fingerprinted, and had a mugshot taken, before being released on bond. Plaintiff had a combination of personal recognizance and cash bonds, which required him to post money before he was booked in and released.

25.     The timing of the indictments demonstrates the motivation behind them. When the indictments were handed down, Judge Wooten was attending a judicial conference in California. Upon hearing of the indictment and the intention of the CCDAO and the OAG to arrest her at the airport in front of the media, Judge Wooten promptly returned to Texas and surrendered at the Grayson County jail (due to safety concerns involved in surrendering at a jail where defendants who Judge Wooten had sentenced were located).

26.     These arrests were not based on probable cause that any crime had been committed and were wholly unconstitutional.

27.     The CCDAO and the OAG moved forward with a prosecution of Judge Wooten, Plaintiff, and the Carys knowing there was no probable cause and that a crime had not been committed. At one point in the investigation, it is understood upon information and belief that Christopher Milner, CCDAO Chief of Special Crimes Unit, approached a member of the CCDAO with an empty file with Judge Wooten's name on it and told the person to "find something." After years of "investigation," the eventual theory of prosecution was that the Carys gave itemized monetary contributions to Judge Wooten, through Judge Wooten's media consultant, Plaintiff, in exchange for Judge Wooten's decision to proceed with a campaign to unseat the incumbent judge of the 380th Judicial District Court. The problem with this theory of prosecution is that it was never true. Furthermore, even if it was true, such actions would not be illegal – and the CCDAO and OAG knew that these alleged actions would not be illegal when they moved forward with the prosecution.

28.     The CCDAO had ulterior malicious political motivations for investigating, arresting, and prosecuting Judge Wooten. Plaintiff and the Carys were victims of the CCDAO, and they were necessary to complete the CCDAO's illegal prosecution of Judge Wooten and plan to remove her from the bench. Indeed, it is understood upon information and belief that John Roach, Sr., the then District Attorney of Collin County, Texas, contacted the Governor's judicial appointment chair before Judge Wooten, Plaintiff, and the Carys were indicted and told the chair that Judge Wooten was going to be removed from the bench and that former Judge Sandoval should be re-appointed to the bench he previously held.  The CCDAO also wanted Judge Wooten off the bench for reasons including that the CCDAO disagreed with Judge Wooten's rulings in criminal cases. This motivation is evident from a myriad of evidence, including a CCDAO internal email and the redaction of incriminating statements before dissemination of that email as a response to a

public information request, the pressuring of witnesses, destruction of evidence, and the clear misuse and abuse of the grand jury process. Additionally, it was widely known in the legal community that the CCDAO had a Special Crimes Unit headed by Milner who used heavy-handed tactics and strategies to investigate, intimidate, and often overcharge when indicting those who were his perceived enemies. As detailed below, numerous lawyers, elected officials, and courthouse staffers were targeted by the CCDAO during the two terms former District Attorney Roach ran the CCDAO and employed Milner.[2] The OAG knowingly aided the CCDAO in accomplishing their goals by way of investigating and prosecuting Judge Wooten when it was clear that no crime had occurred. Plaintiff and the Carys unfortunately fell victim to this illegal investigation and prosecution of Judge Wooten.

29.    Former CCDAO Assistant District Attorney Jeff Lehman, known as one of the CCDAO attorneys who helped initiate the grand jury investigations against Judge Wooten, Plaintiff, and the Carys, has stated that the CCDAO was aware that Judge Wooten, Plaintiff, and the Carys had not committed any crimes. Lehman has also stated that the reason the CCDAO initiated the grand jury investigation was to remove Judge Wooten from the bench because the CCDAO did not agree with her rulings on criminal cases.

30.    This baseless investigation and prosecution resulted in Plaintiff, Judge Wooten, and the Carys all being illegally and unconstitutionally convicted.

31.    Judge Wooten was forced out of her position as the duly elected judge of the 380th Judicial District Court, exactly as the CCDAO and OAG planned.

---

[2] District Attorney Roach managed and directed the actions of the assistant district attorneys working under him. Attorney Pro Tem White managed and directed the actions of the assistant district attorneys working under him.

32.     A grand jury investigating the conduct of the CCDAO issued a report that, in relevant part, stated the following:

> We, the members of the 380th District Court Grand Jury, July 2010 term, have completed our investigation of criminal activity originating in the Collin County District Attorney's Office (DAO). We are providing this summary as a report to the public.
>
> Our investigation has been guided by our oath, which says in part: "You shall present no person from envy, hatred or malice; neither shall you leave any person unpresented for love, fear, favor, affection or hope of reward; but you shall present things truly as they come to your knowledge, according to the best of your understanding, so help you God."
>
> Our initial concern was the motivation of the DAO in its pursuit of investigations against elected officials. After reviewing documents and listening to the testimony of a dozen witnesses, our judgment is that all activities in the DAO have been carried out with the full knowledge of DA John Roach Sr.
>
> Our specific findings are:
>
> 1. That the DAO has used its authority, and the grand jury system, to investigate marginal cases against individuals acting in both public and private capacities. These investigations have resulted in needless costs and no discernable benefit to the taxpayers of Collin County. The DAO has acted with seeming disregard for the personal, emotional, and financial costs to the individuals concerned.

33.     Plaintiff, Judge Wooten, and the Carys have each since been exonerated.

34.     On February 23, 2023, Plaintiff's petition for Judicial Clemency was granted, setting aside the verdict, and dismissing the criminal case.[3]

---

[3] This Order granting Plaintiff's Petition for Judicial Clemency is attached as **Exhibit 1** and fully incorporated herein.

CAUSE NO. 366-81638-2011

*FILED*
*JUDGE: 366ᵀᴴ DISTRICT COURT*
*COLLIN COUNTY, TEXAS*
*2-27-23*

| The State of Texas | In The District Court |
|---|---|
| -v.- | Of Collin County, Texas |
| James Stephen Spencer | 366th District Court |

**ORDER ON DEFENDANT JAMES SPENCER'S PETITION FOR JUDICIAL CLEMENCY**

This Court has received Mr. Spencer's petition for judicial clemency. The Court FINDS the motion should be and is GRANTED. *verdict set aside case dismissed.*

Signed on: *1/23/23*

The Honorable Tom Nowak,
Judge Presiding

*FILED 23 FEB 23 PM 12: 27*
*MICHAEL GOULD*
*DISTRICT CLERK*
*COLLIN COUNTY, TX*
*BY ___ DEPUTY*

35.    On July 5, 2023, Plaintiff filed an Application for 11.072 Writ of Habeas Corpus Declaring Applicant Actually Innocent in the 366th Judicial District Court in Collin County, Texas.[4]

---

[4] Plaintiff's Application for 11.072 Writ of Habeas Corpus Declaring Applicant Actually Innocent is attached as **Exhibit 2** and fully incorporated herein.

Page **9** of 49

36.     Then, on October 30, 2023, Plaintiff was exonerated, and his unconstitutional convictions were declared void *ab initio* when the District Court granted Plaintiff's request for habeas relief. Notably, <u>the State of Texas agreed that said habeas relief should be granted</u>. [5]

Filed: 10/26/2023 10:55 AM
Michael Gould
District Clerk
Collin County, Texas
By Christina Joseph Deputy
Envelope ID: 80996402

## CAUSE NO. 366-81638-2011

| | |
|---|---|
| JAMES STEPHEN SPENCER | §    IN THE 366TH DISTRICT |
| | § |
| vs. | §    OF |
| | § |
| THE STATE OF TEXAS | §    COLLIN COUNTY, TEXAS |

## <u>ORDER ON APPLICATION FOR 11.072 WRIT OF HABEAS CORPUS</u>

The Court, having considered the Application for 11.072 Writ of Habeas Corpus, filed by James Stephen Spencer (Applicant), and the agreement by the State of Texas that habeas relief should be granted, hereby GRANTS the Applicant's request for habeas relief.

37.     Significantly, in that order, the Honorable Tom Nowak found a violation of Plaintiff's due process rights.

The Court FURTHER FINDS that, in light of the decisions in *Stacy Stine Cary v. State* and *David Cary v. State,* the evidence was legally insufficient to support Applicant's guilty pleas to the following two (2) felony convictions: one (1) count of Bribery, and one (1) count of Money

---

[5] This Order granting Plaintiff's Application for 11.072 Write of Habeas Corpus is attached as **Exhibit 3** and fully incorporated herein.

Laundering, and Applicant's deferred felony conviction for one (1) count of Engaging in Organized Criminal Activity. <mark>The Court therefore FINDS a violation of Applicant's due process rights.</mark>

38.    After Judge Wooten was unconstitutionally convicted, she was also exonerated through the granting of an 11.072 Writ of Habeas Corpus Declaring Actual Innocence as a Matter of Law in the 366th Judicial District Court in Collin County, Texas on May 24, 2017, with the convictions deemed void *ab initio* by the District Court.

39.    In both Plaintiff's and Judge Wooten's cases, the Court relied upon the Court of Criminal Appeals rulings in *Stacy Stine Cary v. State*, 507 S.W.3d 750 (Tex. Crim. App. 2016) and in *David Cary v. State*, 507 S.W.3d 761 (Tex. Crim. App. 2016), that the allegations in the indictments, even if true, were not crimes under Texas law as a matter of law.

40.    As a result of this illegal conviction, Plaintiff:

- Was ordered to pay $90,810 in fines and restitution to Collin County for fees for his appointed attorney;
- Was jailed from February 2013 to May 2013;
- Was ordered to perform 1,000 hours of community service;
- Lost his business income between 2013 and 2017; and,
- Could not obtain a driver's license until May 2023 because of the outstanding money he owed to Collin County for attorney's fees and fines.

41.    This action is brought pursuant to 42 U.S.C. § 1983, the United States Constitution, Texas Constitution, Texas statutes, and common law.

## UNCONSTITUTIONAL INVESTIGATION, PROSECUTIONS, AND CONVICTIONS

### Office of the Attorney General Involvement

42.    At the time of the CCDAO's and the OAG's investigation and prosecution of Judge Wooten, Plaintiff, and the Carys, Gregory Abbott was the Attorney General of Texas.

43.     In December of 2008, CCDAO Chief of Special Crimes Unit Chris Milner requested the assistance of the Criminal Prosecution Division of the Office of the Attorney General of Texas in investigating a case against Judge Wooten. According to White, Milner requested White because Milner had experience working with White on previous occasions and White had "expertise" prosecuting election violations.

44.     On December 3, 2008, Milner sent correspondence to the OAG stating "[m]y division of the Collin County District Attorney's Office is conducting a grand jury investigation into apparent irregularities associated with campaign finance reports submitted by Suzanne Wooten, former primary candidate and soon-to-be incoming district judge for the 380th District Court bench in Collin County, Texas. The investigation, at this time, is focusing on her reporting of campaign contributions and/or expenditures associated with the radio advertising purchased and aired on her behalf prior to the primary election earlier this year." Abbott, the AG, allowed his office and staff, including White, to assist the CCDAO in the prolonged investigation into Judge Wooten.

45.     As noted in an April 12, 2010, OAG Narrative Report by the Criminal Investigations Division, the Collin County District Attorney's Office requested assistance from the OAG in "their investigation into allegations of Election Code Violations in the 2008 Primary Election", that White and OAG Auditor Kyle Swihart "had been assigned to assist the Collin County District Attorney's Office" and that later "the request was changed for the Office of Attorney General to take the lead in the investigation…."

46.     On March 23, 2010, White sent correspondence to Roach stating "the Office of the Attorney General has agreed to provide assistance to your office with the continued investigation

of matters referenced in your request. We will keep you fully informed on the progress of this matter. I look forward to working with you on this."

47.    The OAG had additional/greater resources than the CCDAO and, along with White, was able to provide Attorney General Auditor Kyle Swihart. White would be assisting the CCDAO as a Special Assistant District Attorney, while the CCDAO would maintain control of the investigation.

48.    In an interview with Federal Bureau of Investigation (FBI) investigators in mid-July of 2010, White confirmed that he became involved in the investigation of Judge Wooten in December of 2008 (prior to Judge Wooten taking the bench) and stated to the FBI that he did not know why the CCDAO did not recuse themselves at the beginning of the Judge Wooten investigation. White misrepresented to the FBI that he had been appointed the Attorney Pro Tem *in February of 2010*. Further, White informed the FBI that CCDAO thought that once Greg Willis was elected Collin County District Attorney, the "Wooten investigation would be discontinued if not transferred to the AG's office." The involvement of the Attorney General's Office was further confirmed by John R. Roach, Sr., the then District Attorney of Collin County, Texas, in a Texas Lawyer article dated July 14, 2010, wherein Roach is quoted as saying, "Mr. White operates under my authority but not my direction…" It would become clear that the CCDAO wanted to maintain control over the malicious investigation and prosecution of Judge Wooten, Plaintiff, and the Carys under the guise of the OAG leading the charge.

49.    On July 22, 2010, eight (8) days after the FBI met with White, Defendant Milner and Roach requested that the Office of the Attorney General and its designee (White) become the Attorney Pro Tem for the Judge Wooten investigation.[6] The Order of Recusal and Appointing

---

[6] White's actions are relevant to the liability of the CCDAO under the *Monell* cause of action in this case, because as Attorney Pro Tem, White's actions represent the policies of the CCDAO and were taken in furtherance of those

Attorney Pro Tem signed by Judge Mark Rusch on July 22, 2010, included a provision that the CCDAO may "render such non-prosecutorial support, investigative aid and other assistance as the Attorney Pro Tem deems proper." This would appear to give control of the investigation to the OAG. However, White had been working as a Special Assistant District Attorney with the CCDAO since December of 2008 and was formally "deputized" as an Assistant District Attorney for Collin County in September of 2009. Thus, White worked for the very office (CCDAO) that was recused/disqualified when this "changing of the guard" occurred on paper in July of 2010 where the OAG (White) was appointed Attorney Pro Tem.

50.    The investigative activities preceding any prosecutorial actions continued until at least late 2010. Indeed, in October 2010, Roach admitted in a press release that the CCDAO had been "investigating" Wooten up to the time of its recusal, and that the OAG would "continue the investigation and, if necessary, to prosecute any criminal cases resulting from it. That investigation is still ongoing." The press release indicates the CCDAO held an apparent grudge against Judge Wooten because a grand jury she had impaneled sought to investigate Roach and other members of the CCDAO. Indeed, the CCDAO press release attacked Judge Wooten for impaneling the grand jury, although it was her court's turn in the District Courts rotation to empanel a grand jury at that time.

51.    On July 28, 2011, White/the OAG's Office provided to Judge Wooten's Counsel a 48-page redacted copy of an FBI report. In a pre-trial hearing on July 29, 2011, White admitted on the record that the FBI report was redacted by the Attorney General's Office, not the FBI, prior to its submission to Judge Wooten's counsel on July 28, 2011.  In the hearing on July 29, 2011, White represented to the Court that he and/or the Attorney General's office had redacted portions of the

---

policies. Furthermore, the wrongful conduct of White is evidence of the conspiracy to investigate, prosecute, and convict Judge Wooten, Plaintiff, and the Carys even though they had committed no crime.

report that they did not believe were "relevant."  At that hearing, the Court ordered White to produce the redacted FBI report to defense counsel for Plaintiff, Judge Wooten, and the Carys.

52.      On August 1, 2011, Judge Wooten's Counsel discovered approximately 35 additional pages from the FBI Report that the Attorney General's Office had received when they provided the redacted 48-page report to Judge Wooten's Counsel on July 28, 2011. Most of the approximately 35 pages were summaries of the investigation by the FBI and correspondence with the United States Attorney's Office. In the documents, Judge Suzanne Wooten was listed as the "victim" with the suspects listed as John R. Roach, Gregory Davis, former First Assistant District Attorney for the CCDAO and Christopher Milner.  After a review of the unredacted FBI report, it was clear that the FBI report contained information that was exculpatory and revealed information about the CCDAO's illegal conduct.

### Abuse of the Grand Jury Process

53.      In September of 2008, the first known grand jury subpoena was issued as a result of a criminal investigation against Judge Wooten before she took the bench in January of 2009. At least nine grand jury subpoenas for documents were issued in the Fall of 2008 alone.

54.      In September 2009, Milner started issuing grand jury subpoenas for Judge Wooten's employees, numerous people who contributed funds to Judge Wooten's campaign, and other persons related to the campaign, including Plaintiff.

55.      The CCDAO used at least six grand juries to investigate this criminal case against Judge Wooten, Plaintiff, and the Carys. More specifically, the grand juries of the Fall of 2008, Spring of 2009, Fall of 2009, Spring of 2010, Fall of 2010, and Fall of 2011. Four of the six grand juries were used to subpoena bank records, phone records, credit card documents, personal records,

emails, and various campaign-related vendor information. Three of the six grand juries were used to subpoena witnesses.

56.    District Judge Chris Oldner presided over one of the grand juries (Fall of 2009). That grand jury wrote a letter to Judge Oldner explaining that they felt the cases presented to them by the CCDAO and OAG involving two elected officials (including Judge Wooten) were politically motivated, a waste of tax payers' dollars, and that no crimes had been committed. The final version of the letter was not sealed and became public knowledge shortly thereafter.  It was well known that this grand jury was used in the investigation of Judge Wooten, however, references to Judge Wooten were removed and/or intentionally omitted from the final version of the letter so that the illegitimate "investigation" of Judge Wooten could continue.

57.    In April of 2010, the FBI began investigating three attorneys in the CCDAO: District Attorney John Roach, First Assistant District Attorney Greg Davis, and Chief of Special Crimes Unit Assistant District Attorney Chris Milner, for allegations that the CCDAO was misusing the grand jury to create politically motivated investigations against Judge Wooten and Collin County District Attorney candidate Greg Willis (a former Collin County Judge).

58.    The FBI investigation involved numerous interviews. One of those interviews was with grand jury member, D.J.,[7] who was on the Fall of 2009 grand jury that heard the Wooten and Willis investigations. According to D.J., Assistant District Attorney (ADA) Paul Anfosso usually presented the cases to the grand jury. The exceptions were usually cases involving crimes against children in which the specific ADA assigned to the case made the presentations. There were two exceptions. These exceptions were articulated as being the District Attorney's (DA's) top two

_____

[7] The name of this individual who served on the grand jury is being withheld to protect their identity.

cases and were presented by ADA's Davis and Milner. The cases involved Collin County Judge (and then-leading candidate for DA) Greg Willis and Judge Wooten.

59.    D.J. stated that the two cases against Judge Greg Willis and Judge Wooten were completely different from all the other cases heard by the grand jury. The presentation of evidence for the two cases was strange. The prosecutors, Davis and Milner, often set the stage for a witness by telling the grand jury what the witnesses would testify about. The prosecutors often made comments to both D.J. individually and to the grand jury as a whole, which led D.J. to believe both cases may have had underlying personal motivations.

60.    D.J. described the cases against Judge Wooten and Judge Greg Willis as being needlessly dragged out, as no serious evidence was ever presented, even though prosecutors kept promising that a "star witness" would arrive who would make sense of all of it. These two cases were handled totally different from other cases, which moved along more rapidly.

61.    D.J. and other grand jury members started voicing their concerns to Davis and Milner that the DA's Office had conflicts of interest with these cases. D.J. told the prosecutors that **the investigation seemed more like a political witch-hunt**. D.J. asked Davis if his boss (CCDA John Roach) knew what the prosecutors were doing. Davis responded that **of course Roach knew, that was why they were presenting the cases, and that Roach did not like this person (Judge Greg Willis)**. After that comment, Davis tried to backtrack and told D.J. to forget that D.J. heard that comment.

62.    Milner kept promising that the grand jury would hear from a "star witness." This never happened. Milner kept bringing in DA office employees whose testimonies added nothing new to what had already been presented. He seemed to be dragging out the investigation. D.J. surmised that it was all politically motivated.

63.    The Grand Jury asked Milner for them to vote on Judge Wooten's criminal case, but Milner refused to present the case to the grand jury for a vote. This was done because in the event the grand jury no-billed Judge Wooten, Milner would have had to provide substantial evidence to reopen the case. By not formally presenting the case to the Grand Jury before its term ended, Milner could just continue investigating Judge Wooten when the next grand jury's term began. Milner was grand jury shopping.

64.    On June 24, 2010, the Collin County grand jury voted eight to three in favor of a 90-day extension to their six-month term. Collin County District Judge Ray Wheless was presiding over the grand jury at that time. Judge Wheless denied the grand jury the 90-day extension because he felt the Attorney General (OAG) prosecutor (White) was working on behalf of the CCDAO and not the OAG.

65.    Despite Judge Wheless denying the extension of the Spring 2010 Grand Jury, on June 28, 2010, White contacted both of Judge Wooten's defense counsel and requested that Judge Wooten appear at an *added* Grand Jury session to be held on June 30, 2010. Judge Wooten and her counsel offered to and did meet with White, Brian Chandler (another Assistant Attorney General) and Kyle Swihart on June 29, 2010.  Judge Wooten had set aside 3 hours of her docket to accommodate the meeting. The meeting was short and when Judge Wooten and her counsel asked White and his team if they had any questions for her, they stated they did not, and the meeting ended. Judge Wooten perceived the purpose of the meeting as an attempt to intimidate her.

66.    Thereafter, based upon Judge Wooten's information that Judge Wheless' Grand Jury had been dismissed, Judge Wooten's counsel filed a Motion to Quash Illegally Re-Assembled Grand Jury on June 29, 2010. A hearing on the motion was held on June 30, 2010, with Judge Wooten's attorney and White appearing at the hearing. Judge Wheless granted the Motion to

Quash and found that, "[t]he Attorneys representing the State in this matter had absolute (sic) NO authority to re-assemble this Court's Grand Jury after it was discharged on June 24, 2010, without permission of the Court….Therefore, there is no authority for this Court's Grand Jury to re-assemble to conduct any additional business. Any such business will be VOID and have NO AUTHORITY.  Any person who violates this order will immediately be held in CONTEMPT" (no emphasis added).

67.    Prior to the indictments, Collin County District Judge Chris Oldner (presiding Grand Jury Judge of the Fall 2009 Grand Jury referenced herein) admitted to Judge Wooten and Collin County District Judge Mark Rusch that he (Judge Oldner) had two separate meetings with Davis and Milner regarding the substance of their investigations against Judge Wooten and Judge Greg Willis. Judge Oldner informed them that he did not believe that Davis and Milner had presented information that warranted an investigation against Judge Wooten or Judge Greg Willis. Milner and Davis' responses were that they would eventually gather enough information to indict Judge Wooten and Judge Greg Willis. **They just needed more time to investigate**.

68.    Prior to Milner being employed at the CCDAO, grand jury investigations were initiated by law enforcement organizations. There were no independent investigations initiated and conducted by the CCDAO. However, when Milner started his employment with the CCDAO, the Special Crimes Unit was formed, and grand jury cases began to be initiated from within the Special Crimes Unit.

**Abuse of Power for Political Gain by CCDAO and OAG Members**

69.    Rumors of the CCDAO investigation were widespread at the Collin County Courthouse starting in mid-2009 and Milner would often sit in the back of Judge Wooten's courtroom watching her when he had no case on her docket. Judge Wooten perceived this behavior

as an attempt to intimidate her because she had heard that the CCDAO did not like her rulings in criminal cases. Additionally, Plaintiff's and Judge Wooten's financial matters with their long-time banking institutions started changing based upon the banks' receipt of grand jury subpoenas for personal financial records.

70.     Milner and Judge Mark Rusch had a close relationship. Judge Rusch told Judge Wooten that Milner informed him (Judge Rusch) about details of the Judge Wooten and Judge Greg Willis grand jury investigations. Milner explained to Judge Rusch that he wanted to leave the CCDAO with a bang. Judge Rusch had mentioned to Judge Wooten that Milner was looking to prosecute Dallas District Attorney Craig Watkins on a constable investigation. Further, Judge Rusch told Judge Wooten not to worry about Judge Sandoval, but to worry about the "army" coming after her. At that time, Judge Wooten was not aware that Judge Rusch was referring to the Attorney General's Office.

71.     On October 1, 2009, Judge Wooten's attorney, Peter Schulte (Schulte) contacted Milner regarding the CCDAO investigation of Judge Wooten.  Milner demanded that Schulte meet with him immediately. Schulte met with Milner in the Collin County Courthouse and in that meeting, **Milner told Schulte that Judge Wooten had one week to resign, or she was going to be facing indictment and would lose her home, law license, her family, her reputation, and that he would put her in prison for a long time**. When Schulte inquired about the basis for Judge Wooten resigning, Milner replied that "she knows what she did" and that the **"Judge" (CCDA Roach insisted that he be called Judge Roach) would look favorably upon her if she resigned**. Judge Wooten declined Milner's demand and continued her duties as a sitting District Judge.

72.    In October 2009, Plaintiff received an invitation from Milner to participate in "an investigation of suspected criminal misconduct associated with a 2008 political campaign for elected office in Collin County, Texas" and requested his "cooperation with this investigation."

73.    A meeting took place between Milner and Plaintiff. During this meeting, Milner asked Plaintiff to sign a blank confession. Milner explained that he would tell Plaintiff what he was going to say in the confession after Plaintiff signed it. Plaintiff declined to sign the blank confession.

74.    CCDAO Investigator Steve Goodman passed on information that evidence pertaining to the Judge Wooten and Greg Willis investigations was being destroyed within the CCDAO.[8]

75.    On September 21, 2009, Schulte issued a public information request to the CCDAO for any communication the CCDAO had regarding policies and procedures when presenting cases in Judge Wooten's court. On December 16, 2009, the CCDAO responded to Schulte's request with a copy of an internal email from First Assistant Greg Davis to ADA Ben Smith and CCDA Roach, which contained a brief paragraph congratulating Smith and ADA Linda Kirklen for their work on a mortgage fraud trial.

76.    Schulte subsequently obtained an additional copy of what appeared to be the same email, but with additional paragraphs in which Davis stated to only conduct a Trial Before Court (TBC) in Judge Wooten and Judge Jill Willis' courts if the ADA's did not have any interest in the outcome of the case and a TBC was the only way to reasonably dispose of the case. The initial email Schulte received was redacted in efforts to hide the fact that the CCDAO did not want Schulte to know of the CCDAO policies and procedures in Judge Wooten's and Judge Jill Willis'

---

[8] Mr. Goodman has since claimed in an interview with the FBI to be unaware of any destruction of evidence.

courts. This supported the rumors that the CCDAO did not like the rulings Judge Wooten was making in criminal cases.

77.     In August 2010, Judge Wooten was invited "to testify before the Collin County Grand Jury currently investigating events which occurred during the 2008 election and subsequently" and that she was "a suspected person in the pending grand jury investigation…."

78.     On August 28, 2010, the FBI investigation into the CCDAO ended after White told FBI investigators that the CCDAO had a legitimate investigation[9] against Judge Wooten and that the OAG expected to receive a grand jury indictment in the near future.

**Pattern of Similar Conduct by the CCDAO**

79.     A pattern of abuse of power and malicious prosecution for political gain plagued the CCDAO. In the time surrounding the gross misuse of the law against Judge Wooten and Plaintiff, there had accumulated multiple examples of similar abusive conduct applying to a limited subset of people: political adversaries to Roach, Milner, or the donors and allies thereof, including but not limited to the following:

- Collin County Judge Greg Willis was investigated by Milner and Assistant Attorney General David Glickler while Greg Willis was a candidate for the Collin County District Attorney position that would be vacated by Roach. Judge Greg Willis' case was not indicted by the grand jury convened by Milner.

- Denton County Sheriff Weldon Lucas was indicted by Milner a day after the Sheriff's election. The indictment against Sheriff Lucas was thrown out by a judge just over one week later.

---

[9] Based on timesheets obtained from the OAG, White was personally conducting investigation activities as late as at least October 2011.

- Dallas County Sheriff Jim Bowles was indicted by Milner for allegedly funneling more than $100,000 in political contributions into his personal accounts. The indictment was thrown out by a judge. The provision of the Texas Election Code used by Milner does not even specify criminal penalties for the alleged violations.

- Dallas County Jail Commissary Vendor Jack Madera was indicted by Milner only to have the indictment dropped.

- J.V.[10] is a defense attorney who was indicted by Milner for tampering with a government record. The indictment was later thrown out. Upon information and belief, Milner specifically targeted J.V. because of a personal vendetta.

- D.W.[11] is a defense attorney who was indicted by Milner for tampering with a government record. The indictment was later thrown out.

- In similar fashion as the present allegations, an investigation and prosecution of Robert Rodriguez was conducted by the CCDAO (without police involvement) for theft and misappropriation of fiduciary property. The investigation was initiated at the urging of Scott Ginsburg, a major campaign contributor to then District Attorney Roach. The investigation was conducted by Milner, in the shadowy "special crimes" division of the CCDAO. An indictment was obtained based on false, incomplete, and misleading information. Again, no investigation was conducted by the police. Rodriguez was ultimately acquitted when a jury found him not guilty of the criminal charges brought by the CCDAO.

---

[10] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by their wrongful prosecution.

[11] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by this wrongful conduct.

80. As part of Judge Wooten's analogous civil rights lawsuit against Collin County, Texas, she retained Joseph Brown as an expert witness to provide his expert opinion regarding the practices of the CCDOA as they related to the investigation, prosecution, and conviction in her case.[12] *Wooten v. Roach, et al*, 4:18-cv-00380-ALM, ECF 135-2.[13]

81. Mr. Brown served for twenty (20) years as a state and federal prosecutor in the state of Texas. In November of 2000 Mr. Brown was elected as the County Attorney of Grayson County, Texas. At the time, Grayson County was one of a relatively small number of counties in Texas in which the office of County Attorney exercised both felony and misdemeanor jurisdiction. This office was the jurisdictional equivalent of a Criminal District Attorney's Office. In 2005, the office of Grayson County Attorney was abolished, the office of Criminal District Attorney was created, and Mr. Brown was elected to that position four times, leaving office in February 2018. While serving as District Attorney, Mr. Brown became active with the state-wide Texas District and County Attorney Association, serving as a board member for several years and in several offices. During this service, Mr. Brown gathered frequently with prosecutors throughout the state for training, board meetings, political functions, and other events which allowed him to become aware of many of the customs and practices in other District Attorneys' offices. From 2009 to 2014 Mr. Brown served by appointment of Governor Rick Perry as a board member of the Texas Department of Juvenile Justice, helping to oversee the operation of Texas' juvenile probation and prison system. Through the service, Mr. Brown became further aware of the operations of prosecutors' offices throughout the state. In 2017 Mr. Brown was nominated by President Donald Trump to serve as the United States Attorney for the Eastern District of Texas and confirmed by the United

---

[12] Mr. Brown's Expert Report from Case No. 4:18-cv-00380-ALM (ECF 135-2 in that case) is attached as **Exhibit 4** and fully incorporated herein.
[13] In 4:18-cv-00380-ALM, Collin County filed a Motion to Strike Expert Joseph Brown (ECF 135). However, the District Court denied that motion to strike (ECF 142).

States Senate, effective February 26, 2018. Mr. Brown served as the chief federal prosecutor for

the Eastern District of Texas from February 26, 2018, until June of 2020. During this service, Mr.

Brown not only supervised federal prosecutors, but interacted with the vast majority of the elected

district attorneys of the 43 counties making up the Eastern District of Texas, and worked directly

with several prosecutors' offices in joint law enforcement activities.

82.    Mr. Brown reviewed the CCDOA investigation into Suzanne Wooten as well as

CCDOA investigations into many others. Mr. Brown's review and opinions are as relevant and

material to Plaintiff's case as they were to Judge Wooten's case, as the unconstitutional

investigation, prosecution, and conviction of Plaintiff was one and the same as Judge Wooten's.

83.    Based on Mr. Brown's review of materials, facts, data, and interviews related to

CCDAO investigations and practices, and based on his education, training, and experience, Mr.

Brown formed the opinion that,

> During the time that Christopher Milner led the Special Crimes Unit,
> the Collin County District Attorney's office had a pattern and
> practice of using its authority to investigate, threaten to prosecute,
> or to prosecute cases that lacked probable cause of guilt against
> individuals with which members of the District Attorney's office
> had personal, professional, or political differences.   While Milner
> led the implementation of the policies that resulted in these patterns
> and practices, District Attorney John Roach, Sr., as the chief policy
> maker for Collin County in regard to the investigation and
> prosecution of criminal matters, endorsed these policies and
> practices.

84.    Based on Mr. Brown's review of materials, facts, data, and interviews related to

CCDAO investigations and practices, and based on his education, training, and experience, Mr.

Brown formed the opinion that,

> by the nature of Mr. Roach's position, the length of time that these
> events took place, the contentious and high-profile nature of the

cases, and the normal course of conduct of a prosecutor's office, it is extremely likely that Mr. Roach had a high level of awareness of Milner's practices.

85.    Based on Mr. Brown's review of materials, facts, data, and interviews related to

CCDAO investigations and practices, and based on his education, training, and experience, Mr.

Brown formed the opinion that,

> there are considerable facts and circumstances demonstrating Mr. Roach's acceptance and endorsement of the policies that led to the patterns and practices addressed in this report.  Initially, by the nature of his position as the elected district attorney for the county, he was the ultimate decision-maker with regard to the policies of the office.  Mr. Roach was an experienced public servant, having served as a state district judge and a justice of the court of appeals prior to being elected district attorney. While the level of involvement differs according to personality, elected district attorneys in a county of the size of Collin County are typically well aware of the policies of their office and the policy-making behavior of their top assistants, especially a top assistant as controversial as Christopher Milner was in Collin County at the time of the events addressed herein. There is no indication in the record that Mr. Roach was any exception.
>
> Moreover, the cases addressed herein, which were the basis of the pattern and practice of improper prosecutions, were by nature high-profile, contentious, and involved targets related to the courthouse – judges, lawyers, bondsmen, sheriffs, and the like.  These cases by nature are the type of case of which the elected district attorney is typically aware. Several, including the investigations of Judge Suzanne Wooten and Judge Greg Willis and the prosecutions of the sitting sheriffs of two large neighboring counties, would have been among the most important, headline-grabbing cases pending in the office in the typical experience of an elected prosecutor, if not the most important.
>
> In addition, the patterns and practices identified herein occurred over an extended period of many years. The prosecutions spanned the entirety of Mr. Roach's time in office and the policies implemented by Mr. Milner and Mr. Roach with regard to the

operation of the Special Crimes Unit were described in the record as implemented by Milner from the beginning of his supervision of the Special Crimes Unit throughout his entire period of employment. The Special Crimes Unit, as a dedicated division of the District Attorney's Office used for the purpose of purported white-collar crime investigations, was a new creation, instituted by John Roach Sr. when he became District Attorney.  In light of these factors, it is unrealistic to believe that John Roach Sr. did not have a significant level of awareness of the patterns and practices identified herein.

86.    Based on Mr. Brown's review of materials, facts, data, and interviews related to CCDAO investigations and practices, and based on his education, training, and experience, Mr. Brown formed the opinion that,

The troubling themes of Milner's routine practices included:

•    Targeting lawyers, judges, clerks, bondsmen or others connected to the courthouse. Former Assistant District Attorney Paul Key reported that Milner, a former Assistant United States Attorney in Dallas, was brought in to the CCDAO by Mr. Roach to "score some big white-collar wins" to burnish Mr. Roach's political resume.  It was believed that Roach was preparing to run for higher office.  According to long-time Dallas criminal defense lawyer Tom Pappas, when Pappas encounter Milner in the Dallas courthouse in the time period that Milner was preparing to move into his position in Collin County, Milner remarked that he "was going to make a bunch of business for the white-collar lawyers". Pappas was troubled by the comment.  Another former subordinate assistant prosecutor in the Special Crimes Unit, Christopher Fredericks, reported that it "seemed like people that annoyed Milner or Roach were targeted".

•    Indicting cases with multiple counts in situations where fewer counts could have been alleged.  While such charging practice is allowable under the law when probable cause exists, Milner employed the practice routinely, aggressively, and in a manner that when viewed in context of his other tactics, was designed to be punitive, rather than to seek justice. Multiple counts in an indictment require a bond to be set for each count, and an over-zealous prosecutor can use this fact to drive up the expense for a criminal

defendant. Multiple witnesses confirmed this was a favorite tactic of Christopher Milner.

• Adding new charges under revised indictments during the course of a prosecution. Milner would routinely amend indictments, requiring additional bond amounts to be paid, and requiring defendants to be re-arrested on new charges. Defense attorneys and fellow assistant district attorneys describe the tactic Milner routinely employed.

• The pre-indictment use of "target letters", threats of indictment to unrepresented defendants, and demands that suspects sign a confession form or face more charges.

• Questionable grand jury practices. Milner aggressively used the Collin County grand jury, issuing an inordinate number of subpoenas requiring individuals to testify in person at the grand jury instead of relying on law enforcement to conduct interviews of witnesses. This practice, in isolation, is not improper when employed on cases which are supported by probable cause. However, when employed as a weapon in cases unsupported by probable cause, or in cases targeted against political or personal adversaries, it is improper.

It is also instructive that Milner's practice of presenting his court-house related cases to a grand jury prior to arresting the subject of a case, rather than applying for an arrest warrant and having a defendant arrested prior to grand jury, allowed Milner to avoid presenting his facts to a judge for a determination of probable cause. In most instances a judge, trained in the law and experienced in probable cause determinations, is a more exacting gate-keeper to an arrest warrant than a grand jury.

Moreover, two separate grand juries took the unusual step of issuing reports criticizing the cases which Mr. Milner had presented. A grand jury for the July 2010 term issued a report that found that the Collin County District Attorney's Office had "used its authority, and the grand jury system, to investigate marginal cases against individuals acting in both public and private capacities with seeming disregard for the personal, emotional, and financial costs to the

individuals concerned." Additionally, the Fall 2009 grand jury empaneled by Judge Chris Oldner issued a report to specifically deny the existence of probable cause for any offense related to Judge Greg Willis, and according to grand juror Dixie Jeffers, believed the whole investigation to be a "political witch-hunt" and would have called it so in their report if not for the intervention of another district judge.

In my experience, the issuance of a written report from a Grand Jury to address any issues outside of the result of the jury's vote on cases is exceedingly rare.  To my memory, I have never known of a grand jury to issue such a report.

•      Over-charging cases. Several of the reviewed cases and many witnesses, including some who were co-workers with Mr. Milner, reflect that Milner would often charge as many charges as possible, as many counts as possible, at the highest level of offense possible.

•      Conducting investigations internally within the District Attorney's Office without the involvement of outside law enforcement.  The vast majority of criminal cases considered by District Attorney's Offices for prosecution originate from outside police agencies.  In fact, in my experience, few prosecutors' offices have divisions which regularly conduct law enforcement investigations. The practice of police agencies conducting investigations and prosecutors handling prosecutorial functions allows for a separation of responsibility that provides a level of check and balance in the consideration of a criminal charge.  While internal investigations are not illegal and certainly have their place, when employed in the setting of political courthouse investigations they increase the risk that political motivations can creep into decision making and taint the investigation and prosecution.

Furthermore, the risk that a prosecutor could be subjected to civil liability without the protection of prosecutorial immunity dictates against a reasonable prosecutor conducting internal investigations, especially in a politically-charged, high-risk prosecution such as investigating sitting district judges.  While prosecutors are normally shielded from civil liability for their acts involved with prosecutorial

functions under the doctrine of prosecutorial immunity, courts have held that when prosecutors engage in purely investigatory functions, they are not so protected. This potential loss of the protection of prosecutorial immunity should have been a risk that the Collin County District Attorney's Office considered in setting a policy of regularly conducting internal investigations of courthouse-related matters.

87.    Based on Mr. Brown's review of materials, facts, data, and interviews related to CCDAO investigations and practices, and based on his education, training, and experience, Mr. Brown formed the opinion that,

It is a bedrock principal of the criminal law practice that every prosecutor knows - the primary duty of any prosecutor is not to convict, but to see that justice is done. The power of a prosecutor is enormous, the breadth of his discretion is vast, and the decisions made by prosecutors are arguably the most impactful that society feels.

The duty to see that justice is done requires a neutral prosecutor who is not improperly motivated by personal or political interests. The operation of the Special Crimes Unit of the Collin County District Attorney's Office under District Attorney John Roach Sr. and Chief of the Special Crimes Unit Christopher Milner failed to meet this standard.

**Post-Indictment Procedural History**

88.    In July of 2011, an offer was relayed to Judge Wooten's attorneys by White that if she resigned, agreed to never run for public office again, and agreed to plead guilty to a non-specific misdemeanor election code violation, the entire indictment would be dismissed. Judge Wooten's re-election would have been in March of 2012. Judge Wooten again declined the offer and shortly thereafter, a "re-indictment" of all defendants – Plaintiff, Judge Wooten, and the Carys – was obtained from the Fall 2011 Grand Jury with the OAG auditor, Kyle Swihart, as the only person appearing (not recorded) that added the charge of money laundering, *inter alia.*

89.     Judge Wooten, Plaintiff, and the Carys were charged by indictment ("re-indictment") on July 14, 2011, with six counts of Bribery, one count of Engaging in Organized Criminal Activity, one count of Money Laundering, and one count of Tampering with a Governmental Record.  Most of such counts being 1st Degree felonies that could result in life in prison.

90.     Judge Wooten's trial was held first. Stacy Cary's trial was held second, Plaintiff's trial was held third, and David Cary's trial was held last.

91.     Judge Wooten, Stacy Cary, and David Cary were each convicted by different juries.

92.     Seeing no chance of receiving a fair trial and the widespread publicity the case had garnered, Plaintiff opted to take a plea deal after an incident during jury selection during his trial, where a panel member stated in front of the rest of the panel that they "knew he did it." The panel member was removed, but the judge refused to grant a mistrial. Plaintiff knew he was going to be convicted like Judge Wooten and Stacy Cary had been before him and saw no other choice but to accept the plea.

93.     David Cary received 14 years confinement, serving 19 months of such sentence in a prison gang unit before his release, and Stacy Cary was placed on probation.

94.     As a result of the conviction, Judge Wooten was placed on probation for ten years, forced to step down from her judicial position, and her license to practice law was suspended for 10 years by the State Bar of Texas Board of Disciplinary Appeals. White personally worked with the State Bar of Texas and testified against Judge Wooten before the State Bar of Texas Board of Disciplinary Appeals to ensure that she was either disbarred or that her license to practice law was suspended.

95.    As a result of his conviction, Plaintiff was placed on probation for ten years. As conditions of that probation, Plaintiff was required to be incarcerated in the Collin County jail for 100 days, pay a fine of $10,000, and perform 1,000 hours of community service. Plaintiff was also required to pay probation supervision fees for his ten years of probation.

96.    Plaintiff's conviction and probation also resulted in him being deprived of his right to possess a firearm, his right to vote, and his ability to serve on a jury.

97.    In addition, Plaintiff suffered serious financial losses related to the wrongful investigation and conviction and the reputational damage inflicted upon him, including but not limited to the loss of income and benefits related to losing his ability to consult on political campaigns, his financial institutions and insurers terminating his accounts, and his credit being severely impaired. Plaintiff also incurred legal expenses in defending against the wrongful investigation and prosecution that stretched on for years.

98.    Beyond the deprivation of his civil rights and the financial and reputational impact suffered as a result of the County's gross misconduct, Plaintiff and his family suffered the mental anguish and emotional distress associated with being terrorized and hunted for years by the most powerful individuals in state and local law enforcement.

99.    The Carys were able to directly appeal their cases. Stacy Cary's case was appealed first.  The Dallas 5th District Court of Appeals affirmed Stacy Cary's conviction. *See Cary v. State*, 05-12-01421-CR, 2014 WL 4261233, at *37 (Tex. App.–Dallas Aug. 28, 2014), *rev'd*, 507 S.W.3d 750 (Tex. Crim. App. 2016). However, in his lengthy dissenting opinion, Justice Kerry P. Fitzgerald offered a scathing dissent, stating that "with respect to the bribery charges at the heart of this case, this case is most unusual because the State's evidence is not merely insufficient - if affirmatively negates an essential element of the bribery charges and *proves appellant not guilty."*

*Id.* at page *37, Dissenting Opinion (emphasis added). Further, Justice Fitzgerald confirmed that all the other counts of the indictment would fail in their entirety as a result.

100.    Several months later, a unanimous panel of the Dallas 5th District Court of Appeals reversed the convictions of David Cary and rendered acquittals on all counts, finding that there "was insufficient evidence to support his convictions" on all counts. *See Cary v. State*, 460 S.W.3d 731, 741 (Tex. App.–Dallas 2015), *aff'd*, 507 S.W.3d 761 (Tex. Crim. App. 2016).

101.    The State in the David Cary case and Stacy Cary case (the OAG) filed a Petition for Discretionary Review (PDR) with the Court of Criminal Appeals. The Court of Criminal Appeals granted PDR on each case and heard the cases in tandem.

102.    On December 14, 2016, the Court of Criminal Appeals handed down their unanimous opinions in both David and Stacy Cary's cases.

103.    In David Cary's case, the Court of Criminal Appeals affirmed the 5th District Dallas Court of Appeals opinion and affirmed the acquittal on all counts. *See Cary v. State*, 507 S.W.3d 761, 768 (Tex. Crim. App. 2016).

104.    In Stacy Cary's case, the Court of Criminal Appeals reversed the opinion of the 5th District Dallas Court of Appeals and rendered acquittals on all counts as well. *See Cary v. State*, 507 S.W.3d 750, 761 (Tex. Crim. App. 2016).

105.    In both cases, the Court of Criminal Appeals held there was insufficient evidence to support all of their convictions. *Id.*

**Plaintiff is Acquitted/Exonerated of Each and Every Allegation Contained in the Indictment**

106.    On February 23, 2023, Plaintiff's petition for Judicial Clemency was granted, setting aside the verdict, and dismissing the criminal case.



CAUSE NO. 366-81638-2011

| | |
|---|---|
| The State of Texas | In The District Court |
| -v.- | Of Collin County, Texas |
| James Stephen Spencer | 366th District Court |

## ORDER ON DEFENDANT JAMES SPENCER'S PETITION FOR JUDICIAL CLEMENCY

This Court has received Mr. Spencer's petition for judicial clemency. The Court FINDS the motion should be and is GRANTED. *verdict set aside case dismissed.*

Signed on: 4/23/23

The Honorable Tom Nowak,
Judge Presiding

107.    On July 5, 2023, Plaintiff filed an Application for 11.072 Writ of Habeas Corpus Declaring Applicant Actually Innocent in the 366th Judicial District Court in Collin County, Texas.

108.    Then, on October 30, 2023, Plaintiff was exonerated, and his unconstitutional convictions were declared void *ab initio* when the District Court granted Plaintiff's request for habeas relief. Notably, the State of Texas agreed that said habeas relief should be granted.

Filed: 10/26/2023 10:55 AM
Michael Gould
District Clerk
Collin County, Texas
By Christina Joseph Deputy
Envelope ID: 80996402

CAUSE NO. 366-81638-2011

| | | |
|---|---|---|
| **JAMES STEPHEN SPENCER** | § | **IN THE 366TH DISTRICT** |
| | § | |
| **vs.** | § | **OF** |
| | § | |
| **THE STATE OF TEXAS** | § | **COLLIN COUNTY, TEXAS** |

## ORDER ON APPLICATION FOR 11.072 WRIT OF HABEAS CORPUS

The Court, having considered the Application for 11.072 Writ of Habeas Corpus, filed by James Stephen Spencer (Applicant), and the agreement by the State of Texas that habeas relief should be granted, hereby GRANTS the Applicant's request for habeas relief.

109.    Significantly, in that order, the Honorable Tom Nowak found a violation of Plaintiff's due process rights.

The Court FURTHER FINDS that, in light of the decisions in *Stacy Stine Cary v. State* and *David Cary v. State,* the evidence was legally insufficient to support Applicant's guilty pleas to the following two (2) felony convictions: one (1) count of Bribery, and one (1) count of Money Laundering, and Applicant's deferred felony conviction for one (1) count of Engaging in Organized Criminal Activity. The Court therefore FINDS a violation of Applicant's due process rights.

110.    After Judge Wooten was unconstitutionally convicted, she was also exonerated through the granting of an 11.072 Writ of Habeas Corpus Declaring Actual Innocence as a Matter

of Law in the 366th Judicial District Court in Collin County, Texas on May 24, 2017, with the

convictions deemed void *ab initio* by the District Court.

111.    In both Plaintiff's and Judge Wooten's cases, the Court relied upon the Court of

Criminal Appeals rulings in *Stacy Stine Cary v. State*, 507 S.W.3d 750 (Tex. Crim. App. 2016)

and in *David Cary v. State*, 507 S.W.3d 761 (Tex. Crim. App. 2016), that the allegations in the

indictments, even if true, were not crimes under Texas law as a matter of law.

### IV.
### CAUSE OF ACTION

### COUNT I

### *Monell v. New York City Department of Social Services*
### Violation of the Fourth and Fourteenth Amendments
### Pursuant to 42 U.S.C § 1983
### Against Defendant Collin County, Texas

112.    Each of the paragraphs of this Complaint are incorporated as if restated fully herein.

113.    Collin County had a policy of pursuing wrongful investigations, arrests, and

prosecutions without probable cause and without due process.  The policymakers in relation to the

wrongful investigations, arrests, and prosecutions pursued without probable cause and without due

process, were Collin County District Attorney John Roach, Sr., and Collin County Attorney Pro

Tem Harry White.

114.    A pattern of similar incidents of abusive investigations, arrests, and prosecutions

plagued Collin County during the relevant periods of this lawsuit. Indeed, multiple examples of

abusive conduct accumulated under the reign of District Attorney Roach, including the

following[14]:

---

[14] Detailed factual support for these and other examples of illegal and unconstitutional investigations, arrests, and prosecutions lacking in probable cause and motivated by political and personal vendettas is found in Joseph Brown's expert report attached as **Exhibit 4** and fully incorporated herein.

- Collin County Judge Greg Willis was investigated by Defendant Milner while he was a candidate for the Collin County District Attorney position that would be vacated by Roach. Judge Greg Willis' case was not indicted by the grand jury convened by Defendant Milner and the David Glickler.

- Denton County Sheriff Weldon Lucas was indicted by Defendant Milner a day after the Sheriff's election. The indictment against Sheriff Lucas was thrown out by a judge just over one week later.

- Dallas County Sheriff Jim Bowles was indicted by Defendant Milner for allegedly funneling more than $100,000 in political contributions into his personal accounts. The indictment was thrown out by a judge. The provision of the Texas Election Code used by Defendant Milner does not even specify criminal penalties for the alleged violations.

- Dallas County Jail Commissary Vendor Jack Madera was indicted by Defendant Milner only to have the indictment dropped.

- J.V.[15] is a defense attorney who was indicted by Defendant Milner for tampering with a government record. The indictment was later thrown out.

- D.W.[16] is a defense attorney who was indicted by Defendant Milner for tampering with a government record. The indictment was later thrown out.

- In similar fashion as the present allegations, an investigation and prosecution of Robert Rodriguez was conducted by the CCDAO (without police involvement) for

---

[15] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by their wrongful prosecution.

[16] The identity of this individual is being withheld to protect them from any additional harm than has already been caused by their wrongful prosecution.

theft and misappropriation of fiduciary property. The investigation was initiated at the urging of Scott Ginsburg, a major campaign contributor to then District Attorney Roach. The investigation was conducted by Defendant Milner, in the shadowy "special crimes" division of the CCDAO. An indictment was obtained based on false, incomplete, and misleading information. Again, no investigation was conducted by the police. Rodriguez was ultimately acquitted when a jury found him not guilty of the criminal charges brought by the CCDAO.

115.    The constitutional violations in this case were the direct result of the policy, custom and practice and general atmosphere within the CCDAO in which political arrests and prosecutions were pursued with zeal and without consequence.

116.    The policy of the CCDAO of targeting citizens and elected officials without probable cause to believe they had engaged in any unlawful conduct was the moving force behind the violation of Plaintiff's constitutional rights.

117.    Indeed, the Special Crimes Unit appears to be little more than a division used by Roach to harass and intimidate political and personal foes, or to do so on behalf of his political donors and allies. The use of the Special Crimes Unit in such fashion shows a pattern, custom, and practice amounting to a policy of the CCDAO of exacting political revenge on behalf of District Attorney Roach and his allies by way of unfounded investigations and prosecutions.

118.    It is particularly important to note the CCDAO was fully aware that Plaintiff had not violated any law. Yet, the CCDAO conducted a lengthy sham investigation, initiated an arrest, and pursued prosecution of Plaintiff. In doing so, the CCDAO ratified the wrongful acts of its employees, agents, and representatives involved in this case.

119.    The policy, custom, and practice of Collin County was to execute, encourage and/or

ratify the arrest and prosecution of individuals and elected officials in Collin County without probable cause and without providing due process. These practices were common and widespread so as to constitute a custom that fairly represents the policy of the Collin County.

120.    At the time of the incident, Milner, Roach, and their co-conspirators were acting pursuant to a custom, policy, practice and/or procedure of the CCDAO. For years, as depicted in countless media accounts and in Joseph Brown's report, attached as Exhibit 4 and fully incorporated herein, the CCDAO had a custom and culture of political prosecutions lacking probable cause. Milner, Roach, and their co-conspirators' actions constitute violations actionable under 42 U.S.C. § 1983 and violations of Plaintiff's clearly established and well-settled rights to be free from unlawful searches, seizures, and prosecutions, as protected by the Fourth and Fourteen Amendments to the U.S. Constitution.

121.    Plaintiff would show that Defendant Collin County is liable because a pattern, practice or policy of constitutional violations existed that led to the violation of Plaintiff's constitutional rights. At the time of Plaintiff's wrongful arrest, prosecution, conviction, and resulting probation and confinement, there was a widespread practice in the CCDAO of abusing prosecutorial powers. The practice was so widespread as to constitute the policy and custom of the Collin County itself.

122.    The County had a policy of pursuing wrongful arrests and prosecution without probable cause and without due process. This policy was outside of the district attorney's role as a prosecutor in one case and instead was the implementing of a policy that is contrary to state and federal law. Additionally, the CCDAO in this case was not attempting to uphold the laws of the State, as the allegations against Plaintiff were not a crime under the laws of the State. As such, because the policy is not about enforcing the laws of the State and instead runs afoul of the laws

of the State and serves as a violation of the Constitution, Roach, as the Collin County District Attorney, was acting as a policy maker on behalf of the County.

123.    However, "If a district attorney exceeds the scope of his prosecutorial duties, a county may be held liable under certain limited circumstances." *Kreuger v. Reimer*, 66 F.3d 75, 76 (5th Cir. 1995) (per curiam) (citing *Turner v. Upton Cnty.*, 915 F.2d 133, 137–38 (5th Cir. 1990)). "Two configurations can lead to a municipality's liability under section 1983 for the acts of its officials[:]" (1) "a municipality's final policymakers are held effectively to made policy or condoned creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees[;]" or (2) "the municipality may be held liable for the illegal or unconstitutional actions of its final policymakers themselves as they engage in the setting of goals and the determination of how those goals will be achieved." *Turner*, 915 F.2d at 136 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)).

124.    Here, regarding the first configuration, District Attorney Roach directed, participated in, and ratified the actions of Assistant District Attorney Milner, knowing the improper motion behind those actions. The widespread practices of pursuing wrongful arrests and convictions through profoundly flawed investigations and false allegations were so well-settled as to constitute *de facto* policy of Collin County and were able to exist and thrive because the policymakers with authority over the same exhibited deliberate indifferences to the problem, thereby effectively ratifying it. A clandestine subsection of the CCDAO (the Special Crimes Unit) was permitted to conduct and facilitate investigations and prosecutions by and at the direction of Roach and Milner without oversight or involvement of outside police agencies. Thus, the first configuration has been properly and sufficiently pleaded.

125.    Regarding the second configuration, the constitutional violations in this case were

the direct result of the policy, custom and practice and general atmosphere within the CCDAO in which political arrests and prosecutions were pursued with zeal and without consequence. Further, the Special Crimes Unit appears to be little more than a division used by Roach to harass and intimidate political and personal foes, or to do so on behalf of his political donors and allies. The use of the Special Crimes Unit in such a fashion shows a pattern, custom, and practice amounting to a policy of the CCDAO of exacting political revenge on behalf of District Attorney Roach and his allies by way of unfounded investigations and prosecutions. This is further demonstrated through Joseph Brown's expert report attached as Exhibit 4 and fully incorporated herein.

126.    The CCDAO had, during the relevant time period of this complaint, an informal custom, practice or policy regarding the wrongful arrest and prosecution of individuals without probable cause of unlawful conduct and without due process.

127.    The above practices, policies, and customs constituted deliberate indifference towards Plaintiff's constitutional rights. The violation of his constitutionally protected rights (including those protected by the Fourth and Fourteenth Amendments) was a direct and foreseeable cause of his injuries. As a result, Plaintiff is entitled to recover actual damages as a matter of law. The practices, policies and customs were the moving forces behind the constitutional violations that resulted in the injury of Plaintiff.

128.    The following constitutional rights were violated by Collin County's unconstitutional policies, practices, and customs outlined in this lawsuit:

<u>**Violation of Substantive Due Process Rights**</u>

129.    As described more fully above, the County by way of the CCDAO run by Roach, deprived Plaintiff of his substantive due process rights, in that he was deprived of a life, liberty, or

property interest in an arbitrary and capricious manner. *Saucedo-Falls v. Kunkle*, 299 Fed. Appx. 315, 319 (5th Cir. 2008).[17]

130.    Plaintiff had liberty interests which were unconstitutionally restricted by being placed on probation for ten years, including but not limited to all of the prohibitions and limitations related to the extensive terms of probation for the 10-year period, including 100 days of incarceration in the Collin County Jail and restricted travel.

131.    As a result of his wrongful and illegal conviction, Plaintiff was as deprived of the following protected rights:

    a.    Plaintiff's Second Amendment right to keep and bear arms, according to Texas Government Code §411.172-a-3 and 18 U.S.C. 922(g).

    b.    Plaintiff was deprived of his right to participate in the political process and disenfranchised because individuals in Texas convicted of a felony are ineligible to vote while on probation according to Section 11.002 of the Texas Election Code.

    c.    Plaintiff was barred from serving on a jury according to Section 62.102 of the Texas Government Code.

    d.    Plaintiff was deprived of his right to participate in the political process because he was barred from running for public elective office according to Section 141.001 of the Texas Election Code.

---

[17] "One form of 'substantive' due process is the substantive protections in the Bill of Rights that have been 'incorporated' into the Fourteenth Amendment to limit the power of the states." *Kovac v. Wray*, 3:18-CV-0110-L, 2019 WL 1057935, at *15 (N.D. Tex. Mar. 5, 2019) (citing *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (Scalia, J., concurring)). Additionally, "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (internal citations omitted). A liberty interest includes that which is, "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 117 S.Ct. 2258 (1997).

132.    The rights were stripped away from Plaintiff, and such represent violations of his substantive due process rights.

## Violation of Procedural Due Process Rights

133.    As described more fully above, the County, through the CCDAO run by Roach, deprived Plaintiff of his constitutional rights, in that he was deprived of a life, liberty, or property interest without the process that was due. *Saucedo-Falls v. Kunkle*, 299 Fed. Appx. 315, 319 (5th Cir. 2008).  Indeed, a judicial finding has been made that the arrest and prosecution of Plaintiff violated his right to due process. Exhibit 3, which is attached and fully incorporated herein.

134.    In the manner described more fully above, the County, through the CCDAO run by Roach, conducted a reckless criminal investigation, knowingly arresting Plaintiff without probable cause and pursued a criminal prosecution of Plaintiff for alleged conduct that was not criminal and based upon "facts" they knew were untrue. *Anderson v. Maggio*, 555 F.2d 447, 452 (5th Cir. 1977) (recognizing a conviction in the absence of evidence that a crime was committed results in a violation of due process.). Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued. Moreover, the County, through the CCDAO run by Roach, continued the prosecution of Plaintiff after they knew that Plaintiff had committed no criminal act.

135.    This misconduct by the County, through the CCDAO run by Roach, directly resulted in the unjust arrest and criminal prosecution of Plaintiff, in violation of his rights under the United States Constitution.

136.    As a result of the violation of Plaintiff's procedural due process rights, Plaintiff suffered injuries, including but not limited to financial harm and emotional distress. Additionally, Plaintiff had liberty interests which were unconstitutionally restricted by being placed on probation for ten years, including but not limited to all of the prohibitions and limitations related to the

extensive terms of probation for the 10-year period, 100 days of incarceration as a condition of that probation, and restrictions on travel.

137.    Additionally, Plaintiff was deprived of the constitutionally protected rights in various property interests, such as the property interest in continued employment.

138.    As a result of his wrongful and illegal conviction, Plaintiff was as deprived of the following protected rights:

        a.   Plaintiff's Second Amendment right to keep and bear arms, according to Texas Penal Code Sec 46.04, Texas Government Code §411.172-a-3, and 18 U.S.C. 922(g).

        b.   Plaintiff was disenfranchised and deprived of his right to participate in the political process because individuals in Texas convicted of a felony are ineligible to vote while on probation according to Section 11.002 of the Texas Election Code.

        c.   Plaintiff was barred from serving on a jury according to Section 62.102 of the Texas Government Code,

        d.   Plaintiff was deprived of his right to participate in the political process because he was barred from running for public elective office according to Section 141.001 of the Texas Election Code.

139.    The misconduct described in this Count was objectively unreasonable, as no government official would have acted in such a manner, and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

140.    The misconduct described in this Count was undertaken by employees and agents of Collin County, including but not limited to Roach, Milner, and their co-conspirators, pursuant

to the policy and practices of Collin County to pursue wrongful arrests and convictions through profoundly flawed investigations and false allegations for the purpose of satisfying political and personal vendettas. In fact, the CCDAO Special Crimes Unit was created by Roach and Milner exclusively for conducting internal investigations without independent detectives or outside police agencies. This allowed for the unrestrained and unquestioned use of CCDAO resources at the direction of Roach and Milner to initiate and conduct operations targeting political rivals and other foes of the CCDAO. In this way, Collin County violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

141.    These widespread practices, so well-settled as to constitute *de facto* policy of Collin County, were able to exist and thrive because the policymaker(s)[18] with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

142.    The widespread practices described in this lawsuit were allowed to flourish because Collin County failed to implement sufficient training and/or any legitimate mechanism for oversight or punishment. Instead, a clandestine subsection of the CCDAO (the Special Crimes Unit) was permitted to conduct and facilitate investigations and prosecutions by and at the direction of Roach and Milner without oversight or involvement of outside police agencies.

143.    As a result of the County's unconstitutional conduct, Plaintiff sustained, and continues to sustain, injuries including emotional pain and suffering.

## Violation of the Fourth Amendment

144.    As described more fully above, the County, through the CCDAO run by Roach, deprived Plaintiff of the clearly established and well-settled constitutional right protected by the

---

[18] The policymakers at issue in this case were Roach and White.

Fourth Amendment to U.S. Constitution to be free from unreasonable searches and seizures, including unlawful detention, arrest, pre-trial conditions of bond, and confinement.

145.    The County, through the CCDAO, seized and detained Plaintiff without probable cause. When the indictment was handed down, Plaintiff travelled to Collin County and surrendered at the Collin County jail. Plaintiff was processed and released after posting a combination of cash and personal recognizance bonds. Plaintiff's arrest and custodial detention was not based on probable cause that any crime had been committed and was wholly unconstitutional.

146.    In the manner described more fully above, the County, through the CCDAO, conducted a malicious criminal investigation, knowingly arresting Plaintiff without probable cause and pursued a criminal prosecution of Plaintiff for alleged conduct that was not criminal and based upon "facts" they knew were untrue. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued. Moreover, the County, through the CCDAO, continued the prosecution of Plaintiff after they knew that Plaintiff had committed no criminal act.

147.    The County's misconduct directly resulted in the unjust arrest and criminal prosecution of Plaintiff, in violation of his rights under the United States Constitution.

148.    As a result of the County violating his rights under the Fourth Amendment to the United States Constitution, Plaintiff suffered injuries, including but not limited to the deprivation of his freedom while held in custody – both during his initial arrest and during the 100 days of confinement in the Collin County Jail as a condition of his probation, restraint on his freedom under probation and bond conditions, financial harm, and emotional distress.

149.    Plaintiff's illegal convictions and imprisonment for 100 days in the Collin County Jail as a condition of his sentence to probation as part of those illegal convictions, which resulted from the County's unconstitutional policies and practices to pursue wrongful arrests and

convictions through profoundly flawed investigations and false allegations for the purpose of satisfying political and personal vendettas, violated Plaintiff's Fourth Amendment rights. Now that his convictions have been deemed void *ab initio*, he can pursue this claim. *Heck v. Humphrey*, 512 U.S. 477, 48-89, 114 S. Ct. 2364, 2372, 129 L. Ed. 2d 383 (1994).

150.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

151.    The misconduct described in this Count was undertaken by employees and agents of Collin County, including but not limited to Roach, Milner, and his co-conspirators, pursuant to the policy and practices of Collin County to pursue wrongful arrests and convictions through profoundly flawed investigations and false allegations for the purpose of satisfying political and personal vendettas. In this way, Collin County violated Plaintiff's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

152.    These widespread practices, so well-settled as to constitute *de facto* policy of Collin County, were able to exist and thrive because policymaker(s) with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

153.    The widespread practices described in the preceding paragraphs were allowed to flourish because Collin County failed to implement sufficient training and/or any legitimate mechanism for oversight or punishment.

154.    As a result of the County's unconstitutional conduct, Plaintiff sustained, and continues to sustain, injuries including emotional pain and suffering.

## V.
## DAMAGES FOR PLAINTIFF

155.    Due to the wrongful acts of the County, Plaintiff suffered mental anguish.

156.    Due to the wrongful acts of the County, Plaintiff suffered lost wages and diminished earning capacity.

157.    Due to the wrongful acts of the County, Plaintiff suffered losses of liberty.

158.    Due to the wrongful acts of the County, Plaintiff suffered reputational harm.

159.    Due to the wrongful acts of the County, Plaintiff suffered significant financial harm.

160.    Plaintiff requests costs of court and expenses, including attorneys' fees.

161.    Plaintiff requests prejudgment interest.

162.    Plaintiff requests post judgment interest.

163.    Plaintiff seeks such other and further relief, general and special, legal and equitable, to which he may show himself justly entitled.

## VI.
## JURY DEMAND

164.    Plaintiff, James Stephen Spencer, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that Defendant Collin County, Texas, be cited to appear and answer herein, and upon a final hearing of the cause, that this Court enter judgment in his favor and against Defendant Collin County, Texas, awarding compensatory damages, costs, and attorneys' fees against Defendant Collin County, Texas and for any other relief this Court deems appropriate, including but not limited to:

a.    damages in an amount within the jurisdictional limits of this Court;

b.    all damages, penalties, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988, and as otherwise may be allowed by federal law;

c.    pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law;

d.      post-judgment interest at the legal rate;

e.      costs of the Court; and

f.      such other and further relief which Plaintiff may be entitled at law or equity.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

*/s/ Breanta Boss*
BREANTA BOSS,
Texas Bar No. 24115768

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com
breanta@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF